594     466 Mass. 594 (2013)

Doe, Sex Offender Registry Board No. 205614 *v.* Sex Offender Registry Board.

# JOHN DOE, SEX OFFENDER REGISTRY BOARD No. 205614 *vs.* SEX OFFENDER REGISTRY BOARD.

Suffolk. October 7, 2013. - December 11, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Sex Offender. Sex Offender Registration and Community Notification Act. Administrative Law,* Hearing, Judicial review, Standard of proof, Regulations. *Witness,* Expert. *Evidence,* Expert opinion.

Discussion of the standard of review applicable to a decision of the Sex Offender Registry Board regarding its classification of a sex offender according to the sex offender's risk of reoffense and degree of dangerousness. [601-602]

At a hearing to classify a female as a level one sex offender, the Sex Offender Registry Board acted arbitrarily and capriciously in failing to consider substantial evidence submitted concerning the effect of gender on recidivism; further, in light of the length of time that had elapsed since regulations for classifying sex offenders last had been revised, and the research that had been published in the intervening years on female sexual recidivism, the hearing examiner abused his discretion in denying the female's motion for funds for an expert witness who could have offered assistance as to the possible limitations of applying existing risk factors to the female. [602-610] CORDY, J., concurring.

CIVIL ACTION commenced in the Superior Court Department on September 1, 2010.

The case was heard by *Paul E. Troy,* J., on a motion for judgment on the pleadings.

The Supreme Judicial Court granted an application for direct appellate review.

*Catherine J. Hinton* for the plaintiff.

*David L. Chenail,* Assistant Attorney General, for the defendant.

*Andrew S. Crouch,* Committee for Public Counsel Services, & *Elizabeth A. Lunt,* for Committee for Public Counsel Services & another, amici curiae, submitted a brief.

LENK, J. John Doe, a female, pleaded guilty to several Federal

charges arising from her prior management of an escort service, including one count of sex trafficking of children, 18 U.S.C. § 1591 (2006).[1] That conviction is a "like violation" to the Massachusetts offense of living off of or sharing earnings of a minor prostitute, G. L. c. 272, § 4B, an enumerated offense requiring registration as a sex offender. See G. L. c. 6, § 178C.

A hearing examiner of the Sex Offender Registry Board (SORB) determined after a hearing that Doe presented a low risk of reoffense and attendant degree of dangerousness, and classified her as a level one sex offender. Doe appealed, claiming both that it was arbitrary and capricious for the hearing examiner not to have evaluated proffered authoritative evidence on recidivism in females, and that it was an abuse of discretion to have denied her motion for funds for an expert witness to testify on the subject. We conclude that it was arbitrary and capricious for the hearing examiner to classify Doe's risk of reoffense and degree of dangerousness without considering the substantial evidence presented at the hearing concerning the effect of gender on recidivism, and that, in the circumstances, the hearing examiner abused his discretion by denying the motion for funds for an expert witness. Therefore, we remand the matter to SORB for further proceedings.

1. *Statutory and regulatory framework.* The requirement to register as a sex offender is governed by a set of statutes enacted in 1999, which were designed "to protect . . . the vulnerable members of our communities from sexual offenders." St. 1999, c. 74, preamble. In enacting the sex offender registration statute, the Legislature was concerned primarily with "the danger of recidivism posed by sex offenders, especially sexually violent offenders who commit predatory acts characterized by repetitive and compulsive behavior." St. 1999, c. 74, § 1. To address this problem, the Legislature created a regime of registration and "classification of such offenders on an individualized basis according to their risk of reoffense and degree of dangerousness." *Id.* An offender may be classified into one of three categories of dangerousness, with differing attendant duties and implications

---

[1] We acknowledge the amicus brief of the Committee for Public Counsel Services and the Massachusetts Association of Criminal Defense Lawyers on behalf of John Doe.

for the public dissemination of the offender's information. See G. L. c. 6, § 178K (2) (a)-(c).

The statute requires that SORB transmit registration information on all offenders to the "police departments in the municipalities where such sex offender lives, has a secondary address and works and attends an institution of higher learning or, if in custody, intends to live and work and attend an institution of higher learning upon release and where the offense was committed and to the Federal Bureau of Investigation." Id. Information pertaining to level one sex offenders is not disseminated to the general public. G. L. c. 6, § 178K (2) (a). The duty to comply with registration requirements persists for twenty years, at a minimum, from the date of conviction of the underlying offense or release from custody. G. L. c. 6, § 178G.

As we have emphasized, the sex offender registration law implicates constitutionally protected liberty and privacy interests. See, e.g., Doe v. Attorney Gen., 426 Mass. 136, 144 (1997). Because of the breadth of the statute, and to safeguard these interests, "careful and individualized due process is necessary to sort sexual predators likely to repeat their crimes from large numbers of offenders who pose no danger to the public, but who are nonetheless caught in the statute's far-flung net of registration." Doe, Sex Offender Registry Bd. No. 972 v. Sex Offender Registry Bd., 428 Mass. 90, 105 (1998) (Marshall, J., concurring in part and dissenting in part).

To facilitate individualized determinations of the likelihood of recidivism, and to serve the public's interest in the accurate identification of potential risk, the statute directs SORB to promulgate regulations for classifying sex offenders into one of the three categories of dangerousness. See G. L. c. 6, § 178K (1)-(2). The statute sets forth a nonexhaustive list of factors to consider, G. L. c. 6, § 178K (1) (a)-(l), which the regulations augment by formulating specific guidelines for the application of each factor. See 803 Code Mass. Regs. § 1.40 (2002) (guidelines). The guidelines list twenty-four factors to consider in making a determination of potential risk. See id. Each factor includes a discussion of the reasons it is germane to predicting recidivism; almost all of the factors are supported by citations to relevant scientific studies. See id. This grounding in

"the available literature," *id.*, ensures that an offender's ultimate classification is the product of reasoned application of validated empirical studies. The guidelines provide that "the definitions, explanations, principles, and authorities contained in these Factors shall guide the Hearing Examiner in reaching a Final Classification decision." *Id.* SORB bears the burden of justifying the appropriateness of its classification determination by a preponderance of the evidence. 803 Code Mass. Regs. § 1.10(1) (2002). See *Doe, Sex Offender Registry Bd. No. 8725 v. Sex Offender Registry Bd.*, 450 Mass. 780, 782 n.4 (2008).

Here, Doe argues that SORB did not meet this burden, particularly in light of compelling scientific evidence that female offenders generally pose a much lower risk of reoffense. Doe argues that the hearing examiner arbitrarily ignored this evidence on female recidivism and reached a classification determination without having considered the effect of Doe's gender on her risk of dangerousness and likelihood of reoffense. She contends further that the hearing examiner abused his discretion in denying her motion for funds for an expert who would have testified to current knowledge on females' risk of sexually reoffending and to the application of the guidelines to one in Doe's circumstances.

*2. Factual background.* We summarize the facts found by the SORB hearing examiner, supplemented by Doe's testimony at the hearing, referenced throughout the examiner's decision.

In 2006, Doe pleaded guilty in the United States District Court for the District of Massachusetts to two counts of conspiracy, 18 U.S.C. § 371 (2006); one count of transporting a minor to engage in prostitution, 18 U.S.C. § 2423 (2006); one count of transporting an individual to engage in prostitution, 18 U.S.C. § 2421 (2006); and one count of sex trafficking of children, 18 U.S.C. § 1591 (2006). The convictions arose from Doe's management of an escort service in New England from approximately 2000 to 2002.[2]

Doe started the escort service after ceasing to work as a

---

[2]Doe was not convicted of any offenses relating to working as a prostitute. Working as a prostitute is itself not a "sex offense" within the meaning of the statute requiring registration as a sex offender. See G. L. c. 6, § 178C.

prostitute for various "pimps," at whose hands she had suffered a number of serious physical assaults.[3] The service, which employed up to twenty individuals at any given time, primarily offered erotic full-body massages; Doe instructed her employees that they had the "option" of having sexual relations with clients if the employees were so inclined and if they felt they could do so safely. Doe collected a fixed dollar amount from each payment that an employee received, and the employee kept the remainder, whatever the nature of the services performed.

Although she asked potential employees for identification documents before hiring them, Doe employed four minors in her escort service between 2001 and 2002. One of the minors, Minor A, began working for Doe when she was fourteen years old, using a false New York identification card that listed her age as nineteen. Doe sent Minor A on multiple client calls, in Massachusetts, New Hampshire, and Rhode Island, and sometimes drove her to these calls. In July of 2001, Doe saw Minor A's picture on a National Center for Missing and Exploited Children poster and learned the girl's actual age. Shortly thereafter, she directed another employee to telephone the center to report Minor A's location.

The resulting criminal investigation by the Federal Bureau of Investigation revealed the employment of Minors B, C, and D in Doe's escort service. Approximately three years after she ceased operation of the service, Doe was arrested; she was indicted for and pleaded guilty to sexually offending only against Minor A.[4] Doe was sentenced to a term of incarceration for the crime of transporting a minor to engage in prostitution, deemed served while she spent seventeen months incarcerated awaiting trial, prior to entry of her plea. She was sentenced to a three-year period of supervised release for the other offenses.

3. *Sex offender classification proceedings.* In April, 2008,

---

[3]Doe experienced several beatings by at least two pimps. She testified that such beatings included her having been whipped by a bungee cord, having suffered broken ribs from being kicked continuously, and having her head repeatedly submerged under water to the point where she lost consciousness.

[4]The hearing examiner found that, for purposes of her guilty pleas and sentencing, Doe had acknowledged sending Minors B, C, and D on calls in 2001 and 2002, although she said that she did not then know their true ages.

SORB notified Doe of its preliminary recommendation that she be classified as a level two sex offender, pursuant to G. L. c. 6, § 178K (2) (b). Doe timely requested a hearing to challenge that recommendation, pursuant to G. L. c. 6, § 178L (1) (a). She submitted several prehearing motions addressing the applicability of SORB's guidelines to female sex offenders. A hearing was held on October 8, 2008. After the hearing, but before rendering a decision, the hearing examiner recused himself with the agreement of the parties. A second hearing examiner was appointed to assume the case and issue a decision on the basis of the record and the previous examiner's findings.

Prior to the hearing, Doe moved for funds for an expert witness, pursuant to G. L. c. 6, § 178L (1) (a), to testify concerning research on female sexual recidivism. She argued that SORB's guidelines did not encompass scientific research regarding rates of reoffense among female sex offenders. In support of this argument, Doe submitted nearly all of the scientific studies cited by the guidelines' twenty-four risk factors, demonstrating that the studies were based almost exclusively on male subjects. She also offered two additional articles, not referenced in the guidelines, that specifically studied female sex offenders. One of the authors of those articles has published extensive research on other aspects of male sex offender recidivism, relied upon throughout the guidelines' discussion of the various risk factors. See 803 Code Mass. Regs. § 1.40.

Stating that research into female sex offender recidivism is "a work in progress" that "does not rise to the level of a breakthrough as to warrant restructuring the SORB classification guidelines," the first hearing examiner denied Doe's motion and subsequently denied her motion for reconsideration, made at the hearing. The second hearing examiner affirmed this decision, stating that there was "no reason to exercise discretion" to grant Doe's motion, where the regulations provide that females are to be classified in the same manner as males and the statute uses gender-neutral language, and where Doe "offered only an unpersuasive generic need for an expert witness."

At the hearing, Doe testified on her own behalf and presented the testimony of a friend familiar with her escort service, in addition to letters from other friends, her former prison guard,

her brother, and her sister-in-law. Doe testified to her personal history and the circumstances that led her to prostitution and to running an escort service. She stated that she initially turned to prostitution at a time when she was an active drug abuser; her criminal record includes convictions of a number of drug-related offenses, among them possession of marijuana and cocaine. Doe's drug abuse continued throughout the time she was running the escort service.

Doe denied recruiting individual employees to work for her escort service. Rather, she testified that candidates approached her seeking work after seeing advertisements that she ran in local newspapers. The individuals that Doe hired often had worked previously as prostitutes for what Doe termed local "pimps"; Doe stated that she encouraged people to leave their pimps and to work for her instead because she offered a safer working environment.[5]

Doe eventually became romantically involved with a man who helped her to stop her drug abuse, and by the time she became pregnant with their child in 2002, she was no longer using drugs. She has not done so since that time. After the birth of her daughter, Doe let the escort service advertisements lapse and began attending community college in order to obtain a general educational development certificate (GED). She now lives with her daughter and a friend of her mother, and she has been employed as a waitress, bartender, and manager at a restaurant since 2006.

In rendering a decision, the second hearing examiner determined that Doe's Federal convictions of transporting a minor to engage in prostitution and sex trafficking of children were "like violations" matching the Massachusetts offense of inducing a minor into prostitution, G. L. c. 272, § 4A. He determined that Doe posed a low risk of reoffense and should be classified as a

---

[5]Doe and her friend both testified that she earned a reputation among prostitutes as someone who would take them in and provide safe shelter after the pimps they worked for became too abusive. Sometimes Doe provided a rental automobile or a cellular telephone to assist them in leaving abusive pimps. She became known among these women as the "ho savior."

This testimony, while uncontested, was not viewed by the hearing examiner as mitigating in any way. He characterized it as overly "altruistic" and stated, "That [Doe] provided these women *and minors* with a safer place to work does not excuse her behavior" (emphasis in original).

level one sex offender, rather than the level two classification SORB initially recommended. He based his conclusion on the application of certain factors indicating heightened risk, including "repetitive and compulsive" behavior and "sex offenses involving children." See 803 Code Mass. Regs. § 1.40(2), (9)(c)(12). He also noted that Doe's "significant criminal record" contributed to an "elevated concern regarding [her] risk to reoffend and degree of dangerousness." Citing the test for compulsiveness that looks to whether, "in the interval between acts of sexual misconduct, the offender had sufficient opportunity to reflect on the wrongfulness of [her] conduct and take remedial measures by avoidance, counseling or otherwise, to stop [her]self from committing subsequent acts of sexual misconduct," the hearing examiner determined that Doe's conduct was "compulsive" as that term is used in the regulations. See 803 Code Mass. Regs. § 1.40(2)(c). The examiner also considered factors that tend to reduce risk, such as Doe's "acceptance of responsibility" and "current home situation." See 803 Code Mass. Regs. § 1.40(9)(c)(13), 1.40(12).

Doe sought judicial review of SORB's decision in the Superior Court, pursuant to G. L. c. 6, § 178M, and G. L. c. 30A, § 14. A Superior Court judge held that the classification decision was supported by substantial evidence and affirmed SORB's recommended classification level.[6] Doe appealed, and we granted her application for direct appellate review.

4. *Standard of review.* Pursuant to G. L. c. 6, § 178M, a sex offender may seek judicial review of SORB's final classification determination in accordance with G. L. c. 30A, § 14. A reviewing court will set aside or modify SORB's decision if it was "(*a*) [i]n violation of constitutional provisions"; "(*b*) [i]n excess of the statutory authority or jurisdiction" of SORB; "(*c*) [b]ased upon an error of law"; "(*d*) [m]ade upon unlawful procedure"; "(*e*) [u]nsupported by substantial evidence"; "(*f*) [u]nwarranted by facts found by the court . . . where the court

---

[6]The Superior Court judge determined that the "like violation" of Doe's Federal convictions was living off of or sharing earnings of a minor prostitute, G. L. c. 272, § 4B, rather than inducing a minor into prostitution, G. L. c. 272, § 4B, as the hearing examiner had concluded. The Sex Offender Registry Board (SORB) does not dispute this determination.

is constitutionally required to make independent findings of fact"; or "(g) [a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." G. L. c. 30A, § 14 (7).

In reviewing SORB's decisions, we "give due weight to the experience, technical competence, and specialized knowledge of the agency." G. L. c. 30A, § 14 (7). SORB's regulations have "the force of law . . . and must be accorded all the deference due to a statute" (citation omitted). *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 771 (2002). "We 'accord an agency's interpretation of its own regulations considerable deference unless [it is] arbitrary, unreasonable, or inconsistent with the plain terms of the regulations themselves.' " *Doe, Sex Offender Registry Bd. No. 151564* v. *Sex Offender Registry Bd.*, 456 Mass. 612, 623 (2010) (*Doe No. 151564*), quoting *Rasheed* v. *Commissioner of Correction*, 446 Mass. 463, 476 (2006).

5. *Discussion.* Contrary to SORB's characterization of Doe's claim, Doe does not challenge the over-all validity of the guidelines. Rather, she argues that SORB did not meet its burden of proving her risk of sexual reoffense, particularly in light of the hearing examiner's arbitrary failure to consider the relevance of gender as an additional factor alongside the other risk factors outlined in the guidelines. She argues further that the hearing examiner abused his discretion by denying her motion for funds for an expert who would have testified to female sexual recidivism, where Doe showed that the hearing examiner otherwise would not have competent evidence before him to assess Doe's risk of reoffense.

SORB "bears the burden of justifying [its] classification [determination] by a preponderance of the evidence at an evidentiary hearing at which an offender has the right to present evidence and cross-examine witnesses, and after which the hearing examiner must make 'specific, written, detailed, and individualized findings' supporting the board's final classification." *Doe, Sex Offender Registry Bd. No. 941* v. *Sex Offender Registry Bd.*, 460 Mass. 336, 338 (2011), quoting *Doe, Sex Offender Registry Bd. No. 972* v. *Sex Offender Registry Bd.*, 428 Mass. 90, 91 (1998). The guidelines that SORB uses to make these findings were last updated in 2002; the "available

literature" cited is largely between fifteen and twenty years old, see 803 Mass Code. Regs. § 1.40, and is based almost exclusively on observation of male sex offenders. Such emphasis on males is not necessarily surprising, given that the sex offender population is overwhelmingly male. See Cortoni, Hanson, & Coache, The Recidivism Rates of Female Sexual Offenders Are Low: A Meta-Analysis, 22 Sexual Abuse 387, 388 (2010) (Cortoni, Hanson, & Coache) (meta-analysis of ten studies carried out in Australia, Canada, New Zealand, United Kingdom, and United States).[7]

There is a growing body of research, however, on that portion of the sex offender population that is female, approximately five per cent of all offenders. See *id.* As we noted in *Doe No. 151564, supra* at 621 n.5, a case examining the importance of consideration of a sex offender's current age in reaching a classification determination, "[k]nowledge concerning sexual offender recidivism risk has advanced considerably during the past [eleven] years." *Id.,* quoting Public Safety and Emergency Preparedness Canada, Predictors of Sexual Recidivism: An Updated Meta Analysis, at 1 (2004). Since 2002, an increasing amount of research has focused on female sexual recidivism, suggesting that different pathways lead females to offend,[8] and that females have weaker impulses to reoffend; research has found that females have a much lower rate of sexually reoffending than do males, with some studies showing a one per cent recidivism rate as compared to 13.4 per cent among males. F. Cortoni & R.K. Hanson, Correctional Service of Canada, A Review of the Recidivism Rates of Adult Female Sexual Offenders, at 1, 7, 12 (2005) (Cortoni & Hanson).

---

[7]SORB argues that this article, from 2010, should not be considered on appeal, as it was not part of the 2008 hearing record. This argument is without merit, as we often consider scientific studies in rendering decisions with broad societal implications. See, e.g., *Commonwealth* v. *Walker*, 460 Mass. 590, 601-602 (2011) (citing articles on eyewitness identification issues); *Commonwealth* v. *Pytou Heang*, 458 Mass. 827, 836-837 (2011) (citing articles on accuracy of ballistics testing).

[8]For example, research indicates that female sex offenders are more likely than male sex offenders to have a history of sexual victimization; females are more likely to commit a sex offense with a co-offending male, often as a result of coercion by the male; and offending by females is more likely to occur within caregiving situations. Center for Sex Offender Management, United States Department of Justice, Female Sex Offenders, at 7 (2007).

Much of the research on female sexual recidivism has been published by Dr. R. Karl Hanson, who wrote a number of the articles underlying the existing guidelines, and is thus an "authority" within the meaning of the guidelines. See 803 Code Mass. Regs. § 1.40 ("at a hearing conducted pursuant to 803 [Code Mass. Regs. §§] 1.07 through 1.26, the definitions, explanations, principles, and *authorities* contained in these Factors shall guide the Hearing Examiner in reaching a Final Classification decision" [emphasis supplied]). See also *Doe No. 151564, supra* at 622 (citing with approval "the publications that Doe cites [that] are written by many of the same authorities on whom [SORB] relies in its regulations").

Although the guidelines do not take into account the gender of the sex offender, SORB is empowered by both the statute and the regulations to consider "any information useful," G. L. c. 6, § 178L (1), and 803 Mass. Code Regs. § 1.38(2) (2002), "including information introduced by the plaintiff," *Doe, Sex Offender Registry Bd. No. 3844* v. *Sex Offender Registry Bd.,* 447 Mass. 768, 777 (2006), in arriving at a classification decision. The ability to consider other useful information not specifically contemplated by the guidelines is an important safety valve protecting a sex offender's due process rights. See *id.* To that effect, we held in *Doe No. 151564, supra* at 622-623, that it was error not to consider as other useful information the effect of age on recidivism, notwithstanding the lack of explicit reference to age as a factor in the guidelines, where substantial evidence regarding this effect was presented at the hearing. See *Doe, Sex Offender Registry Bd. No. 136652* v. *Sex Offender Registry Bd.,* 81 Mass App. Ct. 639, 656 (2012) (holding that it was arbitrary and capricious for SORB to fail to consider "studies referenced in the record showing the differences between the psychological development and outlook of children and mature adults" when classifying sex offender who was ten years old at time of offense).

Here, both the first and second hearing examiners accepted in evidence the studies on female sexual recidivism that Doe offered, but concluded that they did not present new information to be taken into account in making a classification determination. Neither hearing examiner questioned the accuracy or the reli-

ability of the studies, or cited countervailing studies. Rather, the first hearing examiner characterized research into female recidivism as a "work in progress" that did not "rise to the level of a breakthrough as to warrant restructuring of the SORB classification guidelines." The second hearing examiner, in rendering a decision, agreed, stating that "[SORB]'s regulations and mission need not be halted until a greater consensus on the predictors of female sex offender recidivism is reached in the scientific community, nor should [SORB] amend its regulations each time a new study contradicts its factors." He thus concluded that "classification may be determined generically" based on "common sense factors."

SORB argues that the hearing examiners properly declined to give weight to the studies that Doe submitted, because "being a 'female offender' is neither an additional nor mitigating risk factor to be considered by the Hearing Examiner," and the regulations specifically provide that the risk factors are to apply with equal force to both males and females. See 803 Code Mass. Regs. § 1.39(4) (2002). SORB contends further that the studies Doe offered do not prove beyond a reasonable doubt that SORB's risk factors are inapplicable to female sex offenders. This stance misses the mark for several reasons.

First, in sex offender classification proceedings, the offender bears no burden of proof, let alone one beyond a reasonable doubt. Rather, the burden is on SORB to undertake a "sound application of [the risk-classification] factors to derive a true and accurate assessment of an offender's potential for reoffending," *Doe, Sex Offender Registry Bd. No. 136652* v. *Sex Offender Registry Bd.*, *supra* at 656. Second, Doe does not argue that all of the guidelines' risk factors are inapplicable to females, but rather that recent research on females' lower rates of sexual recidivism also should be weighed. As the second hearing examiner noted, SORB need not update its guidelines every time a new study is published. However, the development of evolving research is among the reasons that a hearing examiner is empowered to consider "any information useful" beyond the enumerated risk factors. G. L. c. 6, § 178L (1); 803 Code Mass. Regs. § 1.38(2). The ability to consider other information provides the flexibility to respond to authoritative research as it

is published, where it is relevant in a given case. There is a circularity, and an irony, in SORB's argument that the guidelines apply with equal force to males and females simply because SORB has declared that to be the case in promulgating its regulations, which are themselves based on research conducted almost exclusively on male subjects. SORB's argument thus amounts to the equivalent of the claim that we rejected in *Doe No. 151564, supra* at 622, where "it justifie[d] its decision not to consider age solely on the basis that age is not considered as a factor in its regulations."

Here, authoritative evidence was introduced suggesting that the guidelines, developed as they were from studies of male offenders, could not predict accurately the recidivism risk of a female offender, and that such risk could not be evaluated without examining the effect of gender. One study, from 2005, found that female sex offenders exhibited a one per cent sexual recidivism rate, as compared to a 13.4 per cent sexual recidivism rate in males. Cortoni & Hanson, *supra* at 1, 7, 12. That study cautioned that "risk tools developed on male sexual offenders are unlikely to apply to females. Simply extrapolating from the male sexual offender literature to assess risk in female sexual offenders is likely to lead to invalid risk appraisal and unintended consequences." *Id.* at 12-13. The other study, from 2007, corroborated this finding, concluding that because "most tools that assess sex offense-specific issues have been developed for and normed on male sex offenders, their use with female sex offenders [is] questionable, at best." Center for Sex Offender Management, United States Department of Justice, Female Sex Offenders, at 8 (2007).

The 2005 study called for further research to establish empirically validated risk factors for female sexual recidivism, but suggested that, until such research occurs, "an evaluation of risk take[] into consideration dynamic risk factors related to general recidivism in women. These risk factors include antisocial attitudes and associates, substance abuse as precursor to offending, problematic relationships, and emotional dyscontrol." Cortoni & Hanson, *supra* at 13. Thus, while it is not necessarily the case that all risk factors contained in the guidelines are

categorically inapplicable to females,[9] the proffered research strongly indicates that the factors have a weaker predictive value for females, whose sexual recidivism rates are substantially lower than their general recidivism rates (i.e., commission of any offense, sexual or otherwise). See Cortoni & Hanson, *supra* at 7 (finding female general recidivism rate of 20.2 per cent). See also Cortoni, Hanson, & Coache, *supra* at 396 (finding female sexual recidivism rate of between one and three per cent and general recidivism rate of between nineteen and twenty-four per cent).[10] Moreover, insofar as the proffered research reveals a substantially lower recidivism rate for females as a group, it appears that gender itself has meaningful predictive value as a distinct risk factor.

These studies thus constituted current, validated evidence demonstrating the relevance of gender in assessing the risk of reoffense that Doe posed to the general public. The hearing examiner ultimately rejected this evidence without "cit[ing] any studies to the contrary." *Doe No. 151564, supra* at 622. See *Cohen v. Board of Registration in Pharmacy,* 350 Mass. 246, 251-252 (1966) (rejection of evidence does not create substantial

[9]The guidelines contain a number of risk factors roughly analogous to those identified in the 2005 study. For example, factor 9(b) considers an offender's antisocial behavior, 803 Code Mass. Regs. § 1.40(9)(b) (2002); factor 12 considers the nature of an offender's relationships with family, friends, and acquaintances, 803 Code Mass. Regs. § 1.40(12) (2002); and factor 16 considers an offender's substance or alcohol abuse, 803 Code Mass. Regs. § 1.40(16) (2002).

[10]Indeed, other States also have recognized the limitations of using risk-assessment tools based on males to determine female sexual recidivism. See, e.g., *Matter of Risk Level Determination of S.S.,* 726 N.W.2d 121, 125-126 (Minn. Ct. App. 2007) (department of corrections erred in "fail[ing] to implement a statutorily sound procedure for the comparably few female offenders it must also assess," where tool it relied on was "statistically valid only as applied to male sex offenders, and . . . [had] never been used for female offenders"); *Matter of Coffel,* 117 S.W.3d 116, 128-129 (Mo. Ct. App. 2003) (determination of female sex offender as sexually violent predator not based on substantial evidence where experts had experience with male sex offenders only; "the research that has been performed on the factors that cause males to sexually reoffend cannot be applied to female sex offenders"). California appears to be the only State to have enacted statutory provisions requiring the use of different risk-assessment tools for female sex offenders. See Cal. Penal Code § 290.04(c) (Deering 2008). However, while California's statute directs a review committee to research risk-assessment tools for female sex offenders, it appears that, to date, such a tool has yet to be developed.

evidence to contrary). Just as in *Doe No. 151564, supra* at 622-623, where "it was arbitrary and capricious for [SORB] to classify Doe's 'risk of reoffense and degree of dangerousness' " without considering the "substantial evidence presented at the hearing concerning the effect of age on recidivism," so, too, here SORB arbitrarily and capriciously failed to evaluate evidence of the effect of gender, both on the potency of existing risk factors in predicting reoffense, and as a risk factor in its own right, in arriving at a classification determination.[11]

More broadly, notwithstanding the safety valve of the "any useful information" provision, it is incumbent upon SORB to ensure that its guidelines are, in fact, based on "the available literature." 803 Code Mass. Regs. § 1.40. We do not purport to suggest a frequency with which the guidelines must be updated, but caution that guidelines that fail to heed growing scientific consensus in an area may undercut the individualized nature of the hearing to which a sex offender is entitled, an important due process right. See *Doe, Sex Offender Registry Bd. No. 10800* v. *Sex Offender Registry Bd.*, 459 Mass. 603, 626 (2011), and cases cited. See also *Doe No. 151564, supra* at 623 n.6, citing *Commonwealth* v. *Lanigan*, 419 Mass. 15, 27 (1994) ("Where, as here, scientific knowledge in a field is rapidly evolving . . . the applicable standards may require more frequent modification in order to reflect accurately the current state of knowledge" [citation omitted]). This potential for the frustration of individualized risk assessment is particularly conspicuous where the growing scientific consensus suggests specific factors that have quantifiable effects on recidivism rates, such as age and gender. The sex offender registration statute delegates authority to SORB to implement its statutory provisions and to make classification determinations for individual offenders. See G. L. c. 6, § 178K. SORB, as a body with specialized knowledge, is authorized to make decisions and promulgate regula-

---

[11]Because we decide Doe's claims under the Administrative Procedure Act, G. L. c. 30A, § 14 (7), we do not reach the constitutional arguments, put forth in the amicus brief, that the hearing examiner's failure to evaluate scientific evidence on female sexual recidivism, and its denial of expert-witness funds, violated Doe's right to equal protection pursuant to the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Vega*, 449 Mass. 227, 234 (2007).

tions with all relevant information before it; indeed, "[i]t is in everyone's best interests — including the best interests of sex offenders themselves — that [SORB] work from accurate, up to date, and thorough information." *Doe, Sex Offender Registry Bd. No. 89230* v. *Sex Offender Registry Bd.*, 452 Mass. 764, 774 (2008) (*Doe No. 89320*), quoting *Roe* v. *Attorney Gen.*, 434 Mass. 418, 430 (2001). The application of accurate and up-to-date information, including all known and empirically validated risk factors, thereby ensures that hearing examiners have the tools they need to arrive at individualized classification determinations. Such determinations must be grounded in a corpus of objective facts and data, necessarily dynamic and evolving to revise collective understanding of the risk that various individuals pose to the public. Given that "[t]he sex offender registry law mandates that the board promulgate guidelines to determine accurately 'the level of [an offender's] risk of reoffense and the degree of dangerousness to the public,' " *Doe No. 151564*, *supra* at 623 n.6, quoting G. L. c. 6, § 178K (1), and that eleven years have passed since SORB last updated those guidelines, during which time knowledge and understanding of sexual recidivism has expanded considerably, compliance with this statutory charge requires incorporation of current information.

Particularly in light of the length of time that has elapsed since the guidelines were last revised, and the research published in the intervening years on female sexual recidivism, "the accuracy of the classification decision [would have been] enhanced by the addition to the evidentiary record of additional expert evidence in the form of testimony or reports."[12] *Doe No. 89230*, *supra* at 773. At the very least, an expert could have offered assistance as to the possible limitations of applying SORB's risk factors to Doe.

"[I]n moving for expert witness funds, the burden [is] on the

---

[12]Pursuant to G. L. c. 6, § 178L (1) (*a*), an "indigent offender may . . . apply for and [SORB] may grant payment of fees for an expert witness in any case where [SORB] in its classification proceeding intends to rely on the testimony or report of an expert witness prepared specifically for the purposes of the classification proceeding." The hearing examiner has discretion to grant funds for an expert even where SORB does not intend to use expert evidence. *Doe, Sex Offender Registry Bd. No. 89230* v. *Sex Offender Registry Bd.*, 452 Mass. 764, 773-774 (2008).

sex offender to identify and articulate the reason or reasons, connected to a condition or circumstance special to [her], that [she] needs to retain a particular type of expert. A general motion for funds to retain an expert to provide an opinion on the sex offender's risk of reoffense, without more, would appear to be insufficient." *Id.* at 775. Here, Doe supported her motion for expert funds with significant evidence that the research undergirding SORB's guidelines was limited almost exclusively to male sexual recidivism, in addition to evidence indicating that females have lower over-all rates of sexual recidivism. Doe's request did not demonstrate simply a "generic need for an expert witness," as the second hearing examiner determined, but instead identified a particular characteristic or condition peculiar to her that the guidelines do not appear to contemplate, and that an available expert is qualified to address. It was therefore an abuse of discretion to deny Doe's motion for expert-witness funds, where Doe established that the hearing examiner would not otherwise have competent evidence before him to assess fully Doe's risk of reoffense.[13]

6. *Conclusion.* The judgment of the Superior Court, affirming

---

[13]An expert also might have been useful in shedding light on the application of the guidelines' risk factors to economically motivated, noncontact offenses like Doe's; in particular, an expert could have explained whether the underlying behavior was "repetitive" and "compulsive" within the meaning of the guidelines. See 803 Code Mass. Regs. § 1.40(2). The second hearing examiner acknowledged the financial motivation underlying Doe's crimes, but concluded that "[n]othing in the regulations or statute require[s] an independent determination regarding the sexual motivation behind the commission of a sex offense, the sexual motivation being presumed by the offense itself." While we do not suggest that financially driven offenses cannot also be sexually motivated, the sexual impetus behind a crime should not be so assumed, especially where, as here, there is "no overt evidence" that an individual was motivated "by her own sexual desires and gratification." See *Doe, Sex Offender Registry Bd. No. 151564* v. *Sex Offender Registry Bd.*, 456 Mass. 612, 619 (2010), citing G. L. c. 6, § 178K (1) (b) (iii) ("The board is permitted to consider the underlying facts of the prior conviction"). Furthermore, although the Legislature's inclusion of offenses such as living off of or sharing earnings of a minor prostitute, G. L. c. 272, § 4B, and the dissemination of child pornography, G. L. c. 272, § 29B, within the ambit of the sex offender registration statute, see G. L. c. 6, § 178C, reflects an acknowledgment that people exploit children for a variety of reasons, sexual or otherwise, it does not follow that the underlying conduct of these crimes is necessarily repetitive or compulsive.

The hearing examiner recognized that Doe's "sexual misconduct [was] not

SORB's classification determination of Doe as a level one sex offender, is vacated and set aside. The matter is remanded to SORB for further proceedings consistent with this opinion.

*So ordered.*

CORDY, J. (concurring). I concur completely in the court's holding and rationale, and write separately only to object to the inclusion of footnote 13. The issue discussed in that footnote, whether sex offenses motivated by impulses other than those

prompted by sexual desire or compulsion," but nevertheless concluded that Doe's offending was repetitive and compulsive, a factor that the guidelines identify as establishing a high risk of reoffense. See 803 Code Mass. Regs. § 1.40(2). It is not clear, however, that running an escort service is the kind of "compulsive" sexually deviant conduct anticipated by either the statute or the regulations. The sex offender registration statute does not evince a specific concern with those who are driven to crime by financial need but, in several places, contemplates that a sex offender may have a "mental abnormality," a condition that "predisposes that person to the commission of criminal sexual acts to a degree that makes such person a menace to the health and safety of other persons." See G. L. c. 6, §§ 178C, 178E, 178K (1) (*a*) (i). Accordingly, the statute envisions the need for "counseling, therapy or treatment" to address issues such as "repetitive and compulsive behavior." See, e.g., G. L. c. 6, § 178K (1) (*a*) (ii), (*c*).

As discussed *supra*, in enacting the sex offender registration statute, the Legislature was concerned primarily with protecting vulnerable members of the community from the violent and predatory acts of certain sex offenders. See, e.g., St. 1999, c. 74, § 1 (noting "the danger of recidivism posed by sex offenders, especially sexually violent offenders who commit predatory acts characterized by repetitive and compulsive behavior"); Norton, Haley "Not Optimistic" on Meeting Court's Sex Offender Concerns, State House News Service, Aug. 25, 1999 (statement of Governor Paul Cellucci to criminal justice committee) ("It seems like every time we turn around, there is another terrible instance of one of these monsters molesting a child, raping a woman or spreading terror throughout a community"). See also 42 U.S.C. § 16901 (2006) (Federal analog of Commonwealth's sex offender registration statute, Adam Walsh Child Protection and Safety Act of 2006, enacted to prevent "vicious attacks by violent predators"). Nothing contained in the legislative history or the guidelines of which we are aware, or to which SORB points, suggests that individuals may be predisposed to running escort services, or that doing so may present an irrepressible compulsion akin to a recognized condition such as paraphilia, "characterized by 'recurrent, intense sexually arousing fantasies, sexual urges, or [certain] behaviors.' " *Doe, Sex Offender Registry Bd. No. 1211 v. Sex Offender Registry Bd.*, 447 Mass. 750, 766 n.15 (2006), quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 566 (4th ed. 2000).

that are sexual in nature, such as financial gain, are a proper basis on which to find a risk of reoffense and a corresponding classification by the Sex Offender Registry Board (SORB), is not before the court. To the extent that one might infer from the footnote that only sexually motivated offenses enumerated in the SORB statute are appropriately considered in the risk analysis, I disagree.

In enacting the SORB statute, the Legislature was concerned with protecting vulnerable members of the community, especially children, from sexual predators of all types. Accordingly, the offenses enumerated in that statute include not only violent sexual acts, but also the crimes of inducing or aiding in the inducement of minors into a life of prostitution (G. L. c. 272, § 4A); living off or sharing the earnings of prostitution committed by minors (G. L. c. 272, § 4B); posing or exhibiting children in a state of nudity (G. L. c. 272, § 29A); and disseminating child pornography (G. L. c. 272, § 29B). Persons engaging in such conduct, and posing a risk of doing so in the future, regardless of the motivation of their conduct, are as much a danger to children in the community as other forms of sexual predators. In my view, such persons and the risks they pose are plainly encompassed within the SORB statute, and I would not suggest otherwise.